Good morning, Your Honors. Good morning. May it please the Court, I'm Patrick Cooper for Dr. Maynard. I'd like to reserve about five minutes for rebuttal if possible. One thing I want to say at the outset, and I think the Court's aware of this, this is a procedural due process case, not a substantive due process case. And the District Court, as Your Honors know, held that Dr. Maynard had proven a violation of his procedural due process rights because the State did not afford him an adequate name-clearing hearing with respect to the allegations of fraud leveled against him. Now, I would like to put this case in some context at the beginning because it's going to bear on some of the issues that we have to deal with here. In 1999, the California Legislature enacted some statutes to crack down on health care fraud. We never denied that health care fraud is not an important issue, but like other kinds of important issues, that doesn't mean you throw due process out the window. The statutes, the California statutes, not only allow for a temporary withholding of Medi-Cal money, which the federal law also requires or allows, but the State statutes allow for the director of the State Department of Health Services to summarily suspend the provider from the Medi-Cal program if that provider is being investigated for fraud or abuse. And the State Department of Health Services may initiate the investigation that gives rise to the suspension. You know, counsel, I think we need to get right down to the real issue in this case, and that is whether your client's liberty interest, although he may have one, is defeated because there was no publication. Well, there was, in fact, a publication, if I may, Your Honor, under the Cox v. Riskelli case, which is a Ninth Circuit case decided in 2004. The Ninth Circuit decided that what is required for publication is that the agency make available a document that is available under the Public Records Act or otherwise available to the public. As I understand the facts, there was just a very small window when that was possible that could have been made available and that no one did ask for that file or the findings. So I think that's, I mean, this is, I'm just telling you where the critical issue is as far as I'm concerned. I understand. And if I may respectfully disagree somewhat with your understanding of the facts, Your Honor. The appeals findings were issued October 2000, October 2000. I can give you the site for that in the record. The State did not change its policy regarding publication until we brought the Cox case to the attention of the And the district court specifically said this in the district court's very lengthy decision, that opinion, those appeals findings were available for four years. It is not necessary, and the case law is clear on this, it is not necessary for publication purposes that the State actually release the records to the public under Cox v. Riskelli. It is only necessary that they be available for publication. That is clearly what the state of the law is. That's what Judge Morrow decided. So we had almost a I thought there was also a case Bishop said that the stigmatizing information is, you know, due process is only implicated if it is actually public. Well, let's talk about if it's made available to the public under Cox v. Riskelli, which I think was decided after Bishop. I may be wrong on that. But that issue was raised, and it was also raised in some other cases. And the courts have made it quite clear that it's only enough that it be made available to the public. It doesn't have to actually have been released. That may go to damages, Your Honor. It may be that if Dr. Maynard at trial is unable to prove that it was released to various different people, that may affect how much his reputation was tarnished. But it doesn't go to the publication issue, which is clear if it's subject to public records. We also presented to the district court, and the district court was aware of this, declarations that were not contradicted, indicating that, in fact, these kinds of appeal findings were made available to the public, and we even showed where our office actually obtained those kind of findings. So I, if I may, I don't think publication is an issue in this case. I think that once Cox v. Riskelli was decided, that put an end to that, and that's why their chief administrative law judge, State Department of Health Services chief administrative law judge, issued a declaration saying in October 4, or I think it may have been in 2005, saying that once Cox v. Riskelli was decided, we decided that we were no longer going to make those appeal findings public. So they do not have to be released. They only have to be subject to public information, which these were subject to public information, and the State even admitted that during this period. What I wanted to do, though. Before you move off of Cox, tell us exactly what the holding was there. Well, I believe, first of all, it was not a California case. Secondly, it was an employment case, and I think this whole concept of publication has arose in the context of public employment, and the courts didn't want to get into every public employee who was fired would have some kind of civil rights action, so they've created some very unusual rules with regard. But that being said, nevertheless, what I think it was Judge Rawlinson decided was that it is enough that a record be put into the employee's file, and that under Washington law, that file be subject to a public records request, so that John Q. Public, if he wanted to, could say I'd like to see the employment file for this person. It was not released. It didn't have to be released. Using that very important case, Judge Morrow, who I must say was about as thorough in her 65-page opinion as is possible to be, made it quite clear that that was binding on her, and it fits squarely under the circumstances here, where, again, the appeal findings were issued. At the time they were issued, the State Department of Health Services had a policy of making those appeal findings subject to the public through a public records act request. We presented testimony, declarations showing we had actually obtained those records through public records act request. And that's the current rule, is that the provider or the provider's counsel can't obtain the records. They changed it. Now they've said, all right, we won't release them anymore. Now, I have other publication arguments, but that's... I'm having a little trouble reading Cox and kind of finding the original kernel of it, because it wanders around. For example, here's a statement from Cox, the clear implication of Mustafa and Lamas is that absent expungement, placement of stigmatizing information in an employee's personnel file constitutes publication when the state law classifies it as a public record. So, in a way, we have here what is equivalent to expungement. And in the Cox-Ruskell case, the question was whether there had been this name-clearing procedure afforded to the individual which it was not. So the fact that it was never disclosed and then it was, in effect, removed from the public domain, why isn't that tantamount to the expungement that's talked about in Cox? Well, let's look at the chronology again here. The appeal findings were issued in October 2000. There was no expungement, no effort to expunge them. They were part of the public record at that point. Four years later, when Dr. Maynard is in the middle of this lawsuit and Cox v. Ruskell has decided, the State decides, whoops, we better quit making these things available to the public. Now we'll do our expunging, if you want to use that word. Right. Yeah. I mean for a period of four years. Four years, but then it is out. Yes. And that, I think, Your Honor, I think that can be something that's relevant to the issue of damages. I do not believe, though, it's relevant to the issue, most respectfully, of publication under Cox v. Ruskell. Now, what I wanted to do, I am quite willing to go more and more on that. I honestly did not anticipate that being such a major issue, but I'm going to go along with some guidance. Do you have any case where there was no publication in the sense of anybody actually getting the documents that says that that's a violation? I have seen those cases. While, when I sit down, I will look for those. I think they're in the brief. I actually think, I don't know. That Cox may have suggested that, because I'm not... Cox may have suggested that. That's my problem. How far do we extend that? Well, no, no. I don't. I think in Cox it hadn't been released, if I'm not mistaken. But maybe I'm wrong. Maybe it was released in the newspaper. I may. But I can tell you now, and I will represent to the Court, and I'd be glad if it's not in here. I know, I know Judge Marl made that finding, because I know she was troubled by that. And if you give me one very quick second, I will find that. Or you can do it on record. Okay. But in any event, here it is. Page 1146 at the excerpts of record. Page 1146, excerpts of record. If I may just read that very quickly. Here we go. I believe that that is discussed. Yes, at page 37 of the Court's District Court Order 1146 of the excerpts. So, the lack of any evidence that Dr. Maynard's appeal findings were released to a third party is not relevant given Cox's definition of what constitutes public disclosure. Now, I think I would agree with Judge Marl on that issue. I don't agree with her on every issue, but I agree with her on that issue. And I think there are some cases, I can't, they aren't at my fingertips. Then I wanted to move, just so Your Honors can see the context of this case a little, because this was not the first case in which these defendants, these defendants were sued for a violation of civil rights with Medi-Cal sanctions. They had been sued earlier in the Labrotest case. And in that case, these very same defendants, Bonta was sued, the Director of State Department of Health Services, and also Cates was sued. Remember, Dr. Maynard was suspended April 2000. These people were sued in another case, a putative class action case in June of 2000. In July of 2000, they come to federal court, and Bonta says to the federal court, I'm taking proactive steps. I can give you the citation right in the record where the, I'm taking proactive steps to stop fraud. Plaintiffs are trying to stop me. We're trying to work out the kinks in the system. We need more time. Cates says to the federal court, I'm the one responsible for implementing the methods and standards under 42 CFR section 455.13, which includes a requirement that you afford due process to people affected by this. So under these statements, these both, Bonta and Cates made these statements. Now, I think that's enough to go to a jury and say, how can they now say they have no responsibility for this process? Judge Marl didn't allow us to get to the jury on that issue. On the other issue, which is critical, the two what I call direct actors, Bertrand was the one who did the investigation. She was the one who recommended the suspension. She was the one who misstated that there was an investigation going on, which caused the suspension to last. Instead of being over in October 2000, it went on for another almost two years. We are not, contrary to what Judge Marl held, we're not in a substantive due process case. We don't have to show reckless disregard. We don't have to show anything more than the following. What we have to show is, was Dr. Maynard deprived of due process? He was, procedural due process. And we have to show, did those people who we are saying deprived them of due process cause the deprivation? She said, yes, you're right there, too. Then what's the mental element? Well, the mental element isn't, oh, yes, I was trying to deny Dr. Maynard due process. The mental element is, I intended for his suspension to continue. That's the intent. Now, the two cases I cited for that are very... The first one is that there really was an absence of evidence of him being personally involved in the deprivation. Deliberative interest now being defined as what's been breached is the publication or the availability of publication, if we accept that. But I thought that the downfall, according to the district court, was that you didn't have the connection between that constitutional injury and these defendants. Well, the constitutional injury here, in my opinion, and that's why it's very important. Constitutional injury is continuing to suspend him, publish him, without a name-clearing hearing. They needed policies and procedures in place. Remember, we've told them back in 2000, these very same people, you need policies and procedures that give people name-clearing hearings. And as a matter of fact, the liberty interest was specifically raised, just so you know, we're talking about credibility here, the liberty interest was specifically raised, and at page 241 of the excerpts of record, the plaintiffs in the Labotest case specifically said, you're killing our liberty interest. Bonta and Cates came before the federal court and said, what, a liberty interest? You haven't shown that we ever published this. Now, what I'm saying is, their causal connection is to this whole process that has a system that can allow a doctor to be kicked out of the Medi-Cal program for two years without ever getting a name-clearing hearing, because no one figured out he was under investigation. So their causal connection is not, they're not the ones who did the suspending, they're not the ones who didn't monitor. They're the ones who fell asleep at the policymaking position. And Cates came to federal court in 2000 in Labotest and said, I'm the guy, I'm the one who makes those policies. In this case, all of a sudden he said, I'm not the guy. I think you get that before a jury, I believe, they can either say he should have been the guy or he deterred others from fixing the system because they thought he was the guy. Do you think all the individual defendants are responsible for not setting up a policy with a name-clearing procedure? I think two of them. I think the head of the agency, I don't think she can delegate it, certainly she can delegate tasks, and she obviously can't do this all herself, but she can't delegate her ultimate responsibility, especially after she came to court in 2000 and said, I'm proactive. She was responsible, and then she said, Cates is my guy to do it. So he was responsible, and if they aren't, then they're leading people to conclude that they are, and no wonder the system's not getting fixed. So I think that there is policymaking responsibility on their part. The other two, I think they're direct actors. I'd like to reserve a little time. Good morning, Your Honors. Sandra Goldsmith, Deputy Attorney General, on behalf of the defendants and appellees and cross-appellants. I would like to reserve five minutes for a reply on the cross-appeal, if I may. I think everything's been addressed. Why don't you just argue everything at this point, because he's got one minute for rebuttal, so it might make more sense. Otherwise, we're going to be coming and going. All right. Thank you. Put it all out, and we'll deal with it. Okay. I would like to begin by responding to opposing counsel's comments regarding Cox and the Labo test and individual liability. The Cox issue was raised on our cross-appeal, and we believe that it's important to have a cross-appeal. We believe that the Cox case is distinguishable, and applying it to Maynard is an improper extension of the Cox case. Cox was a case where there was an employment termination, and it was under the Washington Public Records Act. The documents placed in the, stigmatizing documents that had been placed in the, in the, in the, in the, in the, in the, in the employees' file were available to the public upon request pursuant to the Washington Public Records Act. And in California, and we've argued in the briefs, that under the California Public Records Act, there are exemptions, and the appeal findings would not be required to be released to the public under the Public Records Act. The appeal findings were in, they were in, available to the public prior to the Cox case, because no one anticipated what the Cox case would say. And the Cox case came down in, I believe it was early February 2004, and almost immediately afterwards, and just before the judge filed a fourth, request to file a fourth amended complaint in this case, he brought Cox to the district court's attention, and... Let me just understand, during the period 2000 to 2004, the document is in the public record in California. At that time, were there exemptions that would have precluded a public viewing? Yes, there were exemptions. Exemptions? I believe I cited in our briefs the actual statutes under the subsection... Why don't you just tell us, because I see there's a mountain of information. Well, there are so many exemptions, but basically this is confidential information, it's information involving investigation of a case, it's... The California Public Records Act allows, but does not require, the state to use these exemptions. But I would like to go back to the point that... If a reporter had sought the records in, say, 2002, would they have been released? If a reporter? If a reporter had gone and requested these documents in 2002, would they have been released? Presumably, because there was... Yes or no? Well, as a matter of fact, I couldn't say, because it didn't happen, but there was a policy that if a person from the public made a request to the California Public Records Act, that the documents would be released. Okay, so basically the documents were available to the public for those four years. That's correct. And according to Cox, if that's the situation, even if nobody asks for it, they said that placement of the stigmatizing information in the face of a statute mandating release on request constituted publication. So why is this case any different than Cox, at least as to those four years? Well, it's... First, there are several reasons why it's different than Cox, and one of them relates to a point that you made earlier, Your Honor, regarding expungement. When a... There is no evidence whatsoever that anybody requested any of these, the appeal finding, rather, with any information, or the appeal finding in this case is what's at issue, regarding Dr. Maynard. There's no evidence that it was requested. There's no evidence that it was provided. What they're saying in Cox is it doesn't matter. It doesn't matter. Once you put it in there and say open SESAME, that's the constitutional kick point. But I think this is tantamount to the expungement that was referred to in Cox, because there was no evidence of disclosure, and the policy changed, and there will be no disclosure. There's going to be no future disclosure. There's no evidence of past disclosure. It is tantamount to the expungement situation that Cox refers to. Furthermore, in Cox, the Cox suggested that if the employee that requested the expungement, if the employee that requested the expungement there had been allowed to put rebuttal information in, had been allowed to respond to the charges, that the court might have ruled differently. Well, in this case, the very appeal finding that is claimed to be the basis for the liberty interest violation is an appeal finding that resulted from Dr. Maynard appealing the temporary sanctions. And so that appeal finding contains his position in the case, and it refers to the evidence that Dr. Maynard submitted. So that's another way in which the case is distinguished from the Cox case. Also, I think the situation here is extremely different than a termination of an employee, where there's a determination, a final determination, that the employee has done something to warrant the termination. Here, the provider was placed on temporary sanctions. He wasn't formally accused, charged with fraud or misrepresentation. He was ---- That might have been better, though. At least you'd have a ---- I mean, you know, this is almost worse. You're out there on this temporary limbo for all those years. Well, he was under investigation. He was placed on temporary sanctions based on an investigation for fraud or abuse under the Medi-Cal program. And the procedures that the State provides allow him to contest that. And he filed an administrative appeal, and he filed a writ of mandate, and ultimately, he prevailed on the writ of mandate. Because the court found that there was no evidence of an investigation following the issuance of the administrative appeal finding. Now, that ---- I would take issue with that, but that's ---- I mean, that's in the record. But there was a ---- actually, the ---- there's a referral from DHS that went to the Medi-Cal Fraud Bureau and the California Department of Justice, and they asked for a referral, and they had a case, an open case, but the Department of Health Services did not get further information on it, apparently, to submit to the superior court. So the court told the department to conclude its investigation within 30 days or give good cause why it couldn't. Well, it wasn't really the department at that point that was doing the investigation. It was the Department of Justice. And DHS and the Department of Health Services are totally separate, and DHS has no control over the Department of Justice's investigation. But in any event, as a result of the administrative ---- as a result of the petition for writ of mandate, the sanctions were lifted, and Dr. Maynard is now a Medi-Cal provider, and there's no evidence that any ---- that ---- well, what I wanted to say with respect to that is that this is different than a termination, because the result is that there was a determination that there was no investigation of Dr. Maynard for Medi-Cal fraud or abuse, okay? And that's consistent with what he was ---- you know, what was alleged, that there was an investigation, not that he was engaged in fraud or abuse. But he certainly is under a cloud in the sense that he goes to a hospital and wants privileges, and he has to tell them about this charge against him, which has never been really completed or closed. So there's no doubt that there is some stigmatizing aspect of what's happened to him. But, Your Honor, self-disclosure is not a basis for finding the kind of disclosure required for a liberty interest violation. And ---- Kagan. Well, that may or may not be, but you were saying that this wasn't like a termination of your job. It has some very serious consequences for any doctor. Wouldn't a patient, if a patient looked during 2000 to 2004 and saw, gee, this doctor that I'm considering going to has been accused of fraud, that's pretty damning, isn't it? Well, I don't know why the patient would know that. There's ---- if Dr. Maynard could have a non-Medi-Cal practice in addition to the Medi-Cal practice, and once he was reinstated, he could provide services to Medi-Cal patients and beneficiaries and bill for those. Unless he disclosed to these people, there is no evidence that the appeal ---- there was anything disclosed under the appeal finding. But isn't that more of a damages question than a liability question? I don't think so, Your Honor. I think it goes to liability. And as to damages, that's a very interesting point, because Dr. Maynard was supposed to produce evidence of damages and never did. We took all the discovery that we got from Dr. Maynard on the damage issue, and we hired, you know, two experts who reviewed it and found that there were no financial damages suffered by Dr. Maynard. And there was never any attempt to do any discovery on our experts, and there was no evidence presented of financial damage whatsoever. And that would be a good summary judgment. I mean, the district court didn't get to that issue. That's correct, but we argued that ---- What his point is, is if, although you did argue it, district court didn't actually address it. And so if there were a liberty claim and potential violation, the question would then be, is there harm to reputation and or actual damages? Has there been a reputation claim harm, you know, in the sense of a tort? No, Your Honor. Okay. So in terms of Cox, I mean, we believe that the Cox is really quite distinguishable, and there, you know, on the expungement basis, there was no evidence of disclosure, and there was no ---- and there will be no disclosure in the future. And on the appeal finding, Dr. Maynard presented evidence on the appeal, and it was taken into account in the appeal finding, and the Cox court indicated that it might rule differently if the plaintiff had been given an opportunity there to provide his own comments regarding the termination. Also, I think we need to keep in mind that, you know, it's ---- and this ties in with, you know, basically providers do not have a property interest, going to property interest, in participating in the Medi-Cal program. And if a provider chooses to, you know, devote a certain amount of property interest or practice to the Medi-Cal program, they are ---- they agree, they enter into contract to abide by the laws and the provisions under Medicaid and Medi-Cal. And I don't ---- there's a case that I don't think I cited, but if the Court would be interested. I think it's interesting on this point, Livingston v. U.S. 934 F. 2nd, 719. I believe it's out of the Sixth Circuit from Michigan. And it talks about the risk that providers take when they engage in participating in a State's Medicaid program. And ---- Is that a case related to whether there's a property interest in the Medicare, Medicaid program? I think it is related generally to due process, but probably more to the property interest. The counsel for the doctor made clear at the outset this is a procedural due process, not substantive. And it's not a question of whether there's a property interest in it, but whether here the procedure is the State didn't even do the investigation it was supposed to do, although it moved the process along. So I'm not sure that those typical Medicare cases probably help us out much in analyzing this, unless that case has something specific to do with the procedure. Maybe it does. I don't know. We don't have that. Yeah. Could you address the question if there ---- let's assume for the moment there is a violation of the liberty, his liberty interest, what individuals are responsible? That's a very good question. That goes to the appeal here. And the liberty interest, remember, as I think the Court pointed out when counsel was arguing, is very ---- it's very limited. The liberty interest that was found to be violated was a result of the placing the administrative authority of appeal finding in a file that was made available to the public, although not given to the public. There's no evidence that it was made available on request. And there ---- none of the defendants in this case have any responsibility for that. And the Court has ---- Who does? Pardon me? They don't. Who does? Well, the ---- I mean, I don't think that it's, you know, really part of this appeal to determine who does. But I can say that there is evidence, you know, in the record that we had declarations provided by people from DHS who basically said that they were responsible for certain aspects of the program. The district court went into great lengths to go over the responsibility and lack thereof for violations in both the order on the motion, the cross motions for summary judgment, and also on Maynard's motion to alter or amend the judgment. And there was no evidence whatsoever that the director ---- first of all, there's, you know, lots of evidence about the delegations that are lawful under State law that the director made regarding various activities. And she ---- she ---- some of it was to the ---- some of the delegation was to the head of audits and investigations and others to the head of the Office of Administrative Appeals, hearings and appeals. And the ---- So is it your position that if there is a liberty interest violation, they sued the wrong people? I didn't hear the last part. If there is a liberty interest violation, did plaintiffs sue the wrong people? Yes. They ---- in terms ---- these defendants had nothing to do with any liberty interest violation, even assuming that that constituted a liberty interest violation, what we've been talking about. The ---- and the LABO test case is also, you know, dealt with in the district court's order and in our briefing. The LABO test case does not stand for what counsel is saying it stands for. There were no admissions in there by the director of DHS or by the ---- who happened to be the head of the Medi-Cal Fraud Prevention Bureau that had nothing to do with audits and investigations. It was a separate entity. He had no ---- he had no involvement whatsoever in Maynard's case, as did Defendant Bonta had no involvement whatsoever in the case. The ---- it's ---- and the ---- furthermore, LABO test doesn't deal at all with the kind of liberty interest that's at issue here. But the admissions that counsel is claiming that these defendants made are not ---- were not made as to what they were responsible for doing. I think it's just ---- it's just ---- it misrepresents what the evidence is in the LABO test case. And the ---- as to defendants Bertrand and Nieto Gomez, while they were involved in some aspects of Dr. Maynard's case, they completely complied with their ---- the legal requirements. The decision to do a pre-checkright review was made in Sacramento. And they followed the law and they followed the directives to ---- as they were supposed to. They ---- and they had nothing to do with the administrative appeal finding whatsoever. And Defendant Bertrand, you know, maybe at most negligently made a statement, you know, to the ---- in the position that there was an investigation going on. She had every reason to believe that there was an investigation going on. And as soon as she found out that there wasn't when she was trying to find out who was assigned, she made another referral for an investigation. And the department took that referral and then made a referral to the Department of Justice. And that was the liberty interest violation that the court found, even if you assume that there was a liberty interest violation, as to Dr. Maynard. And the, you know, the court on the ---- I'm trying to remember if it was probably on both the order granting the defendant's motion for summary judgment and the order denying the defendant ---- the plaintiff's motion for summary judgment and the motion to alter amend, you know, talked about plaintiff not doing discovery, you know, and not perhaps, you know, perhaps he could have sued other people, but he chose not to. And, you know, that ---- but you can't hold the defendants that he did sue liable for what somebody else may or may not have done. And this is not, you know, this is not just injunctive relief. This is a lawsuit against individuals in their individual capacity, and there is no evidence of any of the type of liability involvement that would constitute liability under Section 1983. Thank you. Well, let's see what's remaining. We have a minute and a half. So I'm sure you can have two. You can have two. You know, we sued everyone we thought we could. I guess when the director of the Department of Health Services tells the United States Federal Court that she's being proactive about fraud enforcement, we take her at her word. When she says Alan Cates is complying with the Federal law that requires them to give due process, we take her at her word. We didn't know when we got into court and when the people who recommended the suspension that everyone was going to say, that's not my job, that's someone else's job. So everyone's delegated to everyone. And that's the way the State works, and I understand that. But that doesn't make any sense. Could you just briefly tell me why each one of the individuals is responsible for the liberty interest litigation? All right. Bertrand is responsible. And this is not my words. This is the individual's. This is the words of the district court. She caused the suspension to continue after October 2000 because she's the one who told the hearing officer, ex-party, this is part of their process, they can talk ex-party, she told the hearing officer, ex-party, that he was under criminal investigation. So when you read the hearing officer's appeal findings that counsel suggests are just innocuous, they say he's being suspended and we're continuing it because he's under investigation for fraud. What does she have to do with the publication? Well, publication is not necessarily the constitutional deprivation. Constitutional, in my opinion, most respectfully, constitutional deprivation is to continue the suspension beyond the period when it should have been stopped. This district court has found expressly that if she had told the correct, if she had said, no, they're not under investigation, then the hearing officer would have lifted the suspension. There wouldn't have been any hearing officer's decision to publish. Nieto Gomez is responsible because the evidence tends to show she's not, she didn't make the referral for the investigation. There's evidence going both ways, but that, we're here on summary judgment. Cates was, so those are the two people who were actually on the field causing this to happen. Cates and Bonta are responsible. Bonta was the head of the department. Even though she could delegate tasks, I don't think she could delegate ultimate responsibility for the policies. And Cates is responsible because he went to federal court and said, I am responsible for the policies. And if he now says he's not, a jury could say, well, we don't think you're telling the truth. Or if you are telling the truth now, you may have deterred other people from, from making the policies that needed to be made here. Thank you. I appreciate your argument. Thank you to both counsel. The case of Maynard versus Bonta is submitted and we're adjourned for the morning. All rise. This session is adjourned. Thank you.
judges: B. Fletcher, McKeown. Whyte